# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-CA-00359-SCT

*CONTINENTAL CASUALTY COMPANY*

*v.*

*ALLSTATE PROPERTY AND CASUALTY
INSURANCE COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/22/2016 |
| TRIAL JUDGE: | HON. CHRISTOPHER LOUIS SCHMIDT |
| TRIAL COURT ATTORNEYS: | JOHN A. BANAHAN |
| | MICHAEL RILEY MOORE |
| | ROBERT ELLIOTT BRIGGS, III |
| COURT FROM WHICH APPEALED: | CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF HARRISON COUNTY |
| ATTORNEYS FOR APPELLANT: | MICHAEL RILEY MOORE |
| | JOHN A. BANAHAN |
| ATTORNEY FOR APPELLEE: | ROBERT ELLIOTT BRIGGS, III |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED IN PART AND REVERSED AND RENDERED IN PART. ON CROSS-APPEAL: AFFIRMED - 08/24/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     As Greg Peters and Mike Williams were attempting to position Peters's fishing boat

on its trailer, the winch handle recoiled, struck, and seriously injured Williams. Peters, who

owned the truck, the trailer, and the boat, had two liability insurance policies covering bodily

injury: his truck and trailer were insured by Allstate Property and Casualty Insurance

Company (Allstate) and his boat was insured by Continental Casualty Company (Continental). Ultimately, the insurers settled with Williams for $460,000, each paying $230,000 toward the total settlement. Prior to settlement, however, the insurers had not agreed on apportionment. Continental sought a declaratory judgment in the Circuit Court of the First Judicial District of Harrison County, in which it claimed indemnity from Allstate based on its apportionment theory and also reimbursement for the defense costs it had incurred investigating the claim. Allstate responded with a motion to dismiss, in which it sought indemnity from Allstate based on its own apportionment theory and also sanctions against Continental for having made its defense costs and expenses claim. The circuit court treated the motion to dismiss as a motion for partial summary judgment and granted summary judgment in Allstate's favor, but declined to award sanctions to Allstate. Allstate then filed a motion for summary judgment on Continental's remaining indemnity claim, which the circuit court granted. Continental now appeals the grant of summary judgment on its indemnity claim. Allstate cross-appeals the denial of sanctions. As to Continental's indemnity claim, we reverse the grant of summary judgment to Allstate and render judgment in favor of Continental. As to Continental's claim of entitlement to defense costs, we affirm the grant of summary judgment for Allstate. Finally, we affirm the denial of sanctions to Allstate.

## FACTS AND PROCEDURAL HISTORY

¶2.     Greg Peters and his family took Peters's twenty-six-foot, 2003 Regulator fishing boat to Ship Island, Mississippi, for a beach day and picnic lunch on June 22, 2013, accompanied by their friend Mike Williams and Williams's son. The group returned to the boat launch in

2

Gulfport, Mississippi, and Peters tied off the boat so the others could disembark. Williams then backed Peters's 2012 Chevrolet Silverado truck and the attached trailer down a public launch ramp and into the water so Peters could maneuver the boat onto the trailer. Peters drove the vessel onto the trailer and Williams, on land, hooked the trailer's winch strap, which runs around rollers to position the vessel's bow on the trailer, to the bow. Williams began tightening the winch to draw the vessel onto the trailer, but the bow was off-center. Williams told Peters that he needed to back up the boat so that the bow could be centered on the trailer; but when Peters did, the winch recoiled and the handle struck Williams's left eye, causing serious bodily injuries to Williams.

¶3.     At the time of the accident, Peters's 2012 Chevrolet Silverado truck and trailer were covered by a liability insurance policy from Allstate. The Allstate policy, effective from April 14, 2013, to October 14, 2013, covered liability for bodily injury up to $250,000. Peters also had obtained a liability insurance policy from Continental for his 2003 Regulator fishing boat, which was effective from April 13, 2013, to April 13, 2014, and covered liability for bodily injury up to $300,000.

¶4.     The respective insurance policies contained "other insurance" clauses. The Allstate policy's "other insurance" clause stated the following: "[i]f more than one policy applies on a primary basis to an accident involving **your insured auto**, **we** will bear our proportionate share with other collectible liability insurance." (Emphasis in original.) The Continental policy's "other insurance" clause stated that "[i]f there is any other available insurance that

3

would apply in the absence of this policy, this insurance shall apply as excess over the other insurance . . . ."

¶5.     Peters reported the incident to Continental on August 26, 2013, and Continental assigned Stuart Platt to investigate. Continental requested from Williams an explanation of benefits from his primary health insurance carrier and a medical records authorization form which allowed Continental "to correspond directly with [Williams's] doctors regarding . . . bills and treatment."

¶6.     Platt photographed the boat, trailer, and winch, including the handle which had struck Williams. Platt took recorded statements from Peters, Peters's wife, and Williams. Platt also received authorization from Williams to obtain his medical records. His report of the investigation concluded that Williams ultimately had to have surgery "to reattach the retina" and a second surgery "to place an artificial lens in the eye, to see if they could restore his vision." According to Platt's report of September 13, 2013, "[s]ince the surgeries, [Williams] has experienced some inter-ocular pressure" and "[i]f the pressure in the eye cannot be controlled, another surgery may be needed to insert a valve to allow drainage of fluid from the eye to relieve pressure . . . ." The injury caused Williams to have limited vision and, thus, Platt stated that "[w]e will have to retrieve the [medical] records and monitor [Williams's] medical progress towards maximum medical cure, and determine if he has any permanent disability in the end . . . ." He assumed the combined medical bills and lost wages would be substantial. On September 19, 2013, Platt sent Williams's medical records to Continental

4

from initial evaluations at Gulfport Memorial Hospital and Tri-County Eye Clinic and from a specialist at Vitreoretinal Eye Center.

¶7.  On September 27, 2013, Continental paid Williams $1,000, Peters's policy limit for Medical Payments coverage. Continental also provided a check to Williams for $25,000 in excess of the Medical Payments coverage, but informed him that such payment was not an admission "of liability or wrongdoing, and any monies paid herein are credited toward any ultimate monetary resolution."

¶8.  On October 22, 2013, attorney Robert Schwartz of Biloxi notified Continental that he had been retained on behalf of Williams and, on November 5, 2013, Continental sent Schwartz a copy of Peters's insurance policy. Also on November 5, 2013, Continental's defense counsel, Jedd Malish of New Orleans, opined in an e-mail to Continental that the Allstate auto policy "should provide primary coverage for this claim," that the Continental boat policy "should only provide coverage i[f] [Williams's] damages exceed $250,000," and that "[b]ecause Allstate has primary coverage for this loss, it has the duty to defend this claim."

¶9.  On November 6, Malish informed Continental that Schwartz had requested a copy of the Allstate policy and had informed him that Williams's medical bills were in excess of $100,000, that only twenty to thirty percent of Williams's vision had been restored, that future surgery or surgeries possibly would be necessary, and that Williams was at risk for developing glaucoma. Accordingly, Malish observed that the damages could exceed the $250,000 Allstate auto policy limit and that Continental would be obligated to pay the excess.

¶10.   Peters then made a claim with Allstate. At Allstate's request, Continental sent a copy of Peters's Continental boat policy to Allstate on November 11, 2013. Continental clarified its position that Allstate had provided primary coverage, that it had a duty to defend Peters, and that, consequently, it was obligated to pay up to its policy limit of $250,000.  It tendered Peters's defense to Allstate.

¶11.   Allstate responded on December 19, 2013, and informed Continental that it took the position that the "other insurance" clauses of the policies were in conflict and "that Allstate and [Continental] should share in this loss on a *pro rata* basis according to their respective policy limits." According to Allstate, "[t]he Allstate auto policy has $250,000 of coverage and the [Continental] policy has $300,000 of coverage, which after doing the math means that Allstate has 45% of the available coverage and [Continental] has 55% of the available coverage," therefore "the defense costs and any settlement or other payment should be pro-rated accordingly."

¶12.   Continental replied by letter on January 20, 2014, that no conflict existed between the "other insurance" clauses, since the Allstate policy provided *pro rata* apportionment of coverage where more than one policy was primary, and the Continental policy, conversely, provided that it was to provide coverage in excess of other available insurance. According to Continental, "Mississippi courts have consistently applied the full effect of an excess clause where the other policy provided for *pro rata* coverage." Allstate replied by e-mail on February 11, 2014, that, "[b]ecause the boat insured by the [Continental] policy was the cause of the incident and the trailer was simply present at the scene but not really involved, we do

6

not believe that a court would conclude that the boat policy should have no other exposure other than excess."

¶13. Continental and Allstate ultimately agreed to defend Peters and to reserve the coverage dispute "until the underlying matter is ultimately resolved by settlement or trial." However, the insurers could not agree with regard to which should handle the defense and select defense counsel. Allstate argued that, if Continental was, as it claimed, an excess insurance carrier, then Continental "does not get to choose the way that the case is defended or by whom." In the meantime, Williams's counsel, Schwartz, informed Continental and Allstate that Williams would be demanding $1,285,000.

¶14. Continental expressed, by letter dated July 2, 2014, an interest in attempting mediation of the underlying claim and Allstate agreed. The case settled at mediation on September 19, 2014, for $460,000, with Continental and Allstate each paying fifty percent of that amount to Williams.

¶15. Continental then, on November 3, 2014, sent a demand letter to Allstate requesting $20,000, the difference between the $230,000 Allstate had paid and the Allstate policy limit of $250,000. Continental maintained that Allstate, as primary carrier, was obligated to pay up to its policy limit. Further, Continental demanded $31,979.11 in reimbursement for expenses it had incurred in investigating and defending the claims. Continental's total demand of Allstate was $51,979.11. Allstate rejected the demand in a letter dated November 18, 2014, maintaining that Continental's tendered payment of $230,000 at mediation was $23,000 under what it was obligated to pay under a *pro rata* apportionment. Because

7

Continental "would have 55% of the total exposure," Allstate contended, it had "underpaid at mediation in the amount of $23,000[] (55% of $460,00 is $253,000 and [Continental] only contributed $230,000 to the settlement)."

¶16.    From December 2014 to May 2015, Continental proposed, and Allstate rejected, two proposals to settle the claim for $15,000 and $10,000 respectively, and also a proposal that the companies "have our attorneys work up a stipulated set of facts for a suit seeking declaratory judgment to present to the Court on cross motions."

¶17.    In consequence of the insurers' inability to resolve the dispute, Continental filed suit in the Circuit Court of the First Judicial District of Harrison County on July 7, 2015, claiming entitlement to a total of $40,245.51. Continental sought a declaratory judgment that Allstate was the primary insurer and that Continental was an excess insurer. Continental further sought "to recover contribution from Allstate in the amount of $20,000 arising from Allstate's duties as the sole primary insurer" and also $20,245.51, the "reasonable and necessary defense costs Continental incurred after tendering the defense of Mr. Williams'[s] claim to Allstate."

¶18.    Allstate answered on August 6, 2015. In addition to denying Continental's claims, Allstate counterclaimed for a declaratory judgment that Allstate and Continental both were primary insurers and thus both should have been obligated to pay a *pro rata* apportionment of the settlement. Allstate sought $23,000: "From a total settlement amount of $460,000, Allstate was thus responsible for a payment of $207,000 (45%) and because they paid $230,000 (50%), they are entitled to a reimbursement from Continental in the amount of

$23,000." Allstate further sought sanctions pursuant to Mississippi Rule of Civil Procedure 11 and the Litigation Accountability Act, Mississippi Code Section 11-55-3 *et seq.*, including "reasonable fees and expenses incurred by Allstate in defending" Continental's claims that Allstate had failed to defend.

¶19.    Allstate also filed on August 6, 2015, a motion to dismiss Continental's claims for defense costs and expenses and for sanctions against Continental. Allstate argued that a duty to defend never arose because Williams never filed a lawsuit. According to Allstate, it "actively investigated the incident when it was reported by its insured and continued that investigation up until the time of settlement." Because Continental unilaterally incurred defense costs, according to Allstate, its "claim for recovery of defense costs and expenses is patently frivolous and subject to sanctions" under Rule 11 and the Litigation Accountability Act.

¶20.    Continental filed a response in opposition to Allstate's motion to dismiss on August 24, 2015, in which Continental argued that the motion to dismiss should be converted to a motion for summary judgment based on Allstate's having submitted various exhibits which had not been attached to the pleadings. Continental's response was twofold: first, it argued that "Allstate's conduct during the pendency of Mr. Peters'[s] claim amounted to a wrongful refusal to defend, thus entitling Continental to recover defense costs." Second, Continental claimed entitlement to recover defense costs under a theory of equitable subrogation. Continental responded to Allstate's request for sanctions by indicating that its claim was not frivolous because "Continental not only has some 'hope' of recovering defense costs under

9

at least one of the theories, but it also believes that the facts garnered through discovery will prove Continental's claim for defense costs meritorious."

¶21. The circuit court considered Allstate's motion to dismiss as a motion for partial summary judgment and dismissed Continental's claim for defense costs and expenses, finding that Allstate had no duty to defend because no complaint had been filed based on the underlying claim. The court observed that "Continental began its investigation of the claim prior to its knowledge of the Allstate policy" and therefore, "it appears Allstate's actions or inactions did not affect how Continental conducted its investigation." The circuit court further found that, because Allstate had not breached a duty to defend, Continental was not entitled to recover defense costs under a theory of equitable subrogation. Nevertheless, the circuit court determined that sanctions were not warranted because Continental's defense costs claim was neither frivolous nor had it been "interposed for delay or harassment."

¶22. Allstate moved for summary judgment on the remaining indemnity claim on November 19, 2015. It maintained its argument that both it and Continental had been primary insurers and that, as such, each should have paid a *pro rata* apportionment of the $460,000 claim. Because each insurer paid $230,000 in settlement of the claim, or half, Allstate maintained its argument that Continental should have paid $253,000, fifty-five percent of the total coverage, and that Allstate should have had to pay only $207,000, forty-five percent of the total coverage, leaving an overpayment by Allstate of $23,000.

¶23. On December 7, 2015, Continental filed an opposition to summary judgment and reiterated its argument that its excess clause controlled over Allstate's *pro rata* clause and

that, as such, it was obligated to pay only any amount in excess of Allstate's $250,000 policy limit. Consequently, it claimed entitlement to $20,000 from Allstate, since it had paid $230,000 and, Continental contended, should have paid only $210,000. Continental argued further that, even under Allstate's *pro rata* apportionment theory, Allstate would be entitled to only $20,884, not $23,000.[1] Continental also memorialized these arguments in a motion for summary judgment, filed on January 11, 2016, claiming again that it was entitled to $20,000 because Allstate was the sole primary insurer and Continental was the excess carrier.

¶24. The circuit court granted summary judgment to Allstate on February 22, 2016: "[H]aving reviewed the applicable law as well as the language contained in the policies against the undisputed facts, the Court determines that Continental is a co-primary insurer and should share in the loss with Allstate on a pro rata basis." The court found "particularly relevant" the fact that the "underlying incident directly involved the boat insured by Continental Casualty, invoking the boating liability section of Continental's policy." Ultimately, however, the Court awarded to Allstate $20,884, the amount Continental agreed it was obligated to pay under Allstate's *pro rata* apportionment theory.

¶25. Continental filed its notice of appeal on March 7, 2016. Allstate filed a notice of cross-appeal on the circuit court's denial of sanctions against Continental.

---

[1] According to Continental, where the total coverage was $550,000 ($250,000 Allstate limits plus $300,000 Continental limits), Continental's *pro rata* apportionment ($300,000 of $550,000) would have been 54.54%. As such, Continental's *pro rata* share of the settlement would have been $250,884 ($460,000 times 0.5454). Allstate's *pro rata* share would thus, under Continental's calculation, have been $209,116 ($460,000 minus $250,884). Because Allstate contributed $230,000, according to Continental, it would have overpaid by only $20,884 ($230,000 minus $209,116).

11

¶26. The issues raised on appeal are restated as follows:

1. Whether the circuit court properly granted summary judgment to Allstate on its indemnity claim, having found that both Allstate and Continental should pay the claim on a *pro rata* basis.

2. Whether the circuit court properly granted summary judgment to Allstate on Continental's claim that it was entitled to recover the defense costs and expenses incurred after tendering defense to Allstate.

3. ON CROSS-APPEAL: Whether the circuit court erred by failing to sanction Continental for making a frivolous claim for defense costs and expenses.

Each issue is addressed in turn.

## STANDARD OF REVIEW

¶27. This Court reviews a trial court's grant of summary judgment *de novo*. ***Guidant Mut. Ins. Co. v. Indem. Ins. Co. of N. Am.***, 13 So. 3d 1270, 1275 (Miss. 2009) (citing ***Wise v. United Servs. Auto. Ass'n***, 861 So. 2d 308, 311 (Miss. 2003)). Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c).

> The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If in this view the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor. Otherwise the motion should be denied.

***Robichaux v. Nationwide Mut. Fire Ins. Co.***, 81 So. 3d 1030, 1035 (Miss. 2011) (quoting ***Brown v. Credit Ctr., Inc.***, 444 So. 2d 358, 362 (Miss. 1983)).

12

## DISCUSSION

**1.** **Whether the circuit court properly granted summary judgment to Allstate on its indemnity claim, having found that both Allstate and Continental should pay the claim on a *pro rata* basis.**

¶28. Allstate argues at the outset that "this issue is very simple and can be resolved without any detailed analysis of the two policies and the other insurance clauses." It cites the "long-standing law in Mississippi" that "the issuer of the liability insurance policy to the owner of the vehicle involved in the accident[] is the primary insurer." *Guidant*, 13 So. 3d at 1277. Thus, Allstate contends therefore that, because the boat covered by the Continental policy was in use at the time of Williams's injury, Continental is the primary coverage carrier: "Allstate's policy insures the truck to which the trailer was attached, but it provides no separate coverage for the trailer or boat; the Allstate policy is invoked only because the trailer was attached to the truck they insured."

¶29. In *Guidant*, a volunteer firefighter was driving to the scene of a fire in his personal vehicle when his vehicle collided with another vehicle, seriously injuring the occupants. *Guidant*, 13 So. 3d at 1273. Guidant Mutual Insurance Company insured the firefighter's personal vehicle and Indemnity Insurance Company of North America had issued a business automobile policy to the county which employed the firefighter. *Id.* Applying the "long-standing law in Mississippi" that "the insurance policy issued to the owner of the vehicle is the primary policy," this Court held that Guidant was the primary carrier, its policy having been "issued to the owner of the vehicle." *Id.* at 1277. The Indemnity policy, while it insured county employees, provided "that coverage for vehicles not owned by [the county] or the fire

13

department was 'excess over any other insurance' maintained by the county volunteers or employees on their personal vehicles." *Id.*

¶30.  Allstate is correct that this case is unlike *Guidant* in that the volunteer firefighter in that case was driving his personal vehicle, which was not owned by the county by which he was employed. By contrast, here, Peters owned the boat, trailer, and truck, all three of which were "involved in the accident." But it is undisputed that the truck and trailer were insured by Allstate.[2] Allstate therefore makes an inferential leap to conclude that Continental is the primary insurer, because while Peters's boat was "involved in the accident," Peters's truck and attached trailer also were "involved in the accident."[3] The winch handle that struck Williams was part of the trailer. Moreover, in *Guidant*, the Court examined the language of the "other insurance" clauses in the respective Guidant and Indemnity policies to support its conclusion that Guidant was the primary insurer.

¶31.  This Court has stated that "'[t]he general common law rule is that "the liability of insurers under overlapping coverage policies is to be governed by the intent of the insurers as manifested by the terms of the policies which they have issued."'" *Blue Cross & Blue Shield of Miss., Inc. v. Larson*, 485 So. 2d 1071, 1074 (Miss. 1986) (quoting *Blue Cross &*

---

[2] The Allstate policy included in its definition of "**Insured Auto**" a "trailer while attached to an **insured auto**." (Emphasis in original.)

[3] Continental responds that Allstate is attempting to make an argument this Court rejected, namely the argument Guidant had advanced that "coverage disputes of priority of primary and secondary coverage are resolved by determining the relative proximity the risk bears to the loss . . . ." *Guidant*, 13 So. 3d at 1276. We agree, since Allstate's claim that Continental is the primary insurer based on the boat's involvement in the accident requires either ignoring the involvement of the truck/trailer altogether (which Allstate does not appear to do) or determining that the boat's involvement was greater than that of the truck/trailer.

14

***Blue Shield of Kan., Inc. v. Riverside Hosp.***, 703 P.2d 1384, 1390-91 (Kan. 1985) (quoting

16 *Couch on Insurance* 2d § 62:44, at 480 (rev'd ed. 1983))). *See also* ***Farmers Ins.***

***Exchange v. Hartford Cas. Ins. Co.***, 907 F. Supp. 234, 236 (S.D. Miss. 1995) ("When more

than one insurance policy covers a particular incident, courts look first to the language of the

policies to settle any disputes as to the application of the respective coverages.").

¶32. This Court has observed:

> [W]e gave examples of three broad categories of "other insurance" clauses
> where the phraseology of the policies permitted. The first is a "pro rata" clause
> in which one company is primary but agrees to pay its prorata share with other
> primary insurers. The second category is the "excess" clause, which insures the
> loss only to the extent it is not paid by other insurance. The third category is
> the "escape" clause where the insurer disclaims any liability where there is
> other coverage.

*Larson*, 485 So. 2d at 1072-73 (citing ***Travelers Indem. Co. v. Chappell***, 246 So. 2d 498

(Miss. 1971)). The Court continued:

> [S]o long as the escape v. escape clauses, excess v. excess clauses, and prorata
> v. prorata clauses were identical, the courts held them to be conflicting and
> nugatory so as to cancel each other out, and therefore liability under the two
> policies was prorated between the two insurance policies in the ratio of the
> limits of liability fixed in each policy which bears to the total limits in all of
> the policies covering the risk.

*Larson*, 485 So. 2d at 1073 (quoting *Chappell*, 246 So. 2d at 503). The Court noted,

however, that "where an excess clause is in conflict with . . . a prorata clause in the other

policy, the excess clause ordinarily would be given full effect." *Larson*, 485 So. 2d at 1073

(quoting *Chappell*, 246 So. 2d at 503). *See also* ***Farmers Ins. Exch.***, 907 F. Supp. at 238

(citation omitted) (The "majority rule, by far, is that 'excess insurance' is considered to

15

prevail over pro rata—that is, it is not other valid and collectible insurance within a pro rata clause").

¶33.   Here, the respective insurance policies contained "other insurance" clauses. The Allstate policy's "other insurance" clause stated the following: "[i]f more than one policy applies on a primary basis to an accident involving **your insured auto**, **we** will bear our proportionate share[4] with other collectible liability insurance." (Emphasis in original.) The Continental policy's "other insurance" clause stated that "[i]f there is any other available insurance that would apply in the absence of this policy, this insurance shall apply as excess over the other insurance . . . ."

¶34.   Continental compares its "other insurance" clause, which provided for excess coverage "if there is any other available insurance that would apply," to the "other insurance" clause found in Allstate's policy, which provided that "[i]f more than one policy applies on a primary basis to an accident involving **your insured auto**, **we** will bear our proportionate share with other collectible liability insurance." (Emphasis in original.) While Allstate's "other insurance" clause provided that Allstate would bear a share proportionate with other collectible liability insurance in the event of an accident involving an insured auto, Continental's applied specifically to providing excess coverage when "any other available

---

[4] The Allstate policy defined "our proportionate share" as follows:

> If there is other insurance covering the loss at the time of the accident, **we** will pay only **our** share of any damages. **Our** share is determined by adding the limits of this insurance to the limits of all other insurance that applies on the same basis and finding the percentage of the total that **our** limits represent.

(Emphasis in original.)

16

insurance" would apply. Allstate's policy, too, contained an excess clause: "[i]f an **insured person** is using a **substitute auto** or **non-owned auto**, **our** liability insurance will be excess over other collectible insurance." (Emphasis in original.) Clearly, Allstate's excess clause has no application to the facts of the present case.

¶35.    "[W]here an excess clause is in conflict with . . . a prorata clause in the other policy, the excess clause ordinarily would be given full effect." *Larson*, 485 So. 2d at 1073 (quoting *Chappell*, 246 So. 2d at 503). Accordingly, Continental argues that "the *pro rata* clause in the Allstate policy remains dormant because the Continental policy would not constitute '*collectible* liability insurance' necessary to trigger Allstate's 'other insurance' clause." (Emphasis in original.)

¶36.    This Court has held that the primary insurance policy limits must be exhausted before the excess carrier's liability arises:

> [T]he so-called "other insurance" clause in the primary policy excluding or modifying liability if the additional insured has other valid and collectible insurance is inapplicable because *the insurance under the excess coverage policy is not to be regarded as other collectible insurance available to the insured until the primary policy has been exhausted*.

*Indem. Ins. Co. of N. Am. v. Guidant Mut. Ins. Co.*, 99 So. 3d 142, 156 (Miss. 2012) (quoting *Chappell*, 246 So. 2d at 505 (quoting *Couch on Insurance* 2d § 62:60, 508-509 (1966))) (emphasis added). Accordingly, Continental argues that Allstate's policy limits of $250,000 must be exhausted before Continental's excess clause applies. Because Allstate paid only $230,000, Continental maintains on appeal that it is entitled to recover the $20,000 difference.

17

¶37.   Allstate responds with three arguments: first, it argues that the terms of the Continental policy are ambiguous; second, it argues that the "other insurance" clauses in the Allstate and Continental policies are in conflict and, therefore, Mississippi law requires a *pro rata* apportionment; and third, it argues that Allstate and Continental do not insure the same property for the same risk.

¶38.   Allstate argues first that, because the boating liability section of the Continental policy contains a separate "other insurance" clause, the "other insurance" clause in the general section of the Continental policy renders the terms ambiguous. This Court has held that "[i]f a contract contains ambiguous or unclear language, then ambiguities must be resolved in favor of the non-drafting party." *United States Fid. and Guar. Co. of Miss. v. Martin*, 998 So. 2d 956, 963 (Miss. 2008) (citing *J & W Woods Corp. v. State Farm Mut. Auto. Ins. Co.*, 723 So. 2d 550, 552 (Miss.1998)). "Ambiguities exist when a policy can be logically interpreted in two or more ways . . . ." *Martin*, 998 So. 2d at 963 (citing *Crum v. Johnson*, 809 So. 2d 663, 666 (Miss. 2002)). "However, ambiguities do not exist simply because two parties disagree over the interpretation of a policy." *Martin*, 998 So. 2d at 963 (citing *HeartSouth PLLC v. Boyd*, 865 So. 2d 1095, 1105 (Miss. 2003)).

¶39.   Continental's "other insurance" clause, which appears in the "General Conditions" section of the policy, provides that:

> If there is any other available insurance that would apply in the absence of this policy, this insurance shall apply as excess over the other insurance, but the combined amount shall not exceed the limits of this policy *for any loss under Coverage A, Boat and Boating Equipment or Coverage E, Boat Trailer*.

18

(Emphasis added.) The Continental policy contains a section entitled "Coverage B—Boating Liability." That section includes a provision entitled "Operating Other Boats," which states:

> We will provide this boating liability coverage to the named Insured and any family members, subject to the other provisions of this policy, *while operating another boat with the permission of its owner.* However, we do not cover loss or damage to the other boat or its boating equipment. If there is any other available insurance, we will provide coverage only as excess over such insurance. The liability coverage under this section will not apply if the other boat is: A. a personal watercraft . . . .

(Emphasis added.) Because Coverage B, the boating liability section, is not mentioned in the "General Conditions" excess clause, Allstate argues that Continental could not have intended it to apply, especially in light of the fact that Coverage B has its own excess clause.

¶40.    Continental responds that it specifically limited Coverage A, Boating and Equipment, and Coverage E, Boat Trailer, by including the "shall not exceed the limits of this policy" language. Continental states that it intended excess under Coverage B to provide excess coverage, irrespective of the value of the claim. Continental further responds to Allstate's argument by pointing out that no inconsistency exists between the excess clause contained in the "General Conditions" section and the excess clause found in the "Operating Other Boats" section of Coverage B, since the latter merely reinforces the former. Finally, Continental undercuts Allstate's argument by pointing out that Coverage E, which covers the boat trailer, and is referenced in the "General Conditions" excess clause, also contains an excess clause.[5]

---

[5] "This coverage is excess over any other available insurance for the trailer."

19

¶41. That Continental did not specifically reference Coverage B in the "General Conditions" excess clause demonstrates its intent to provide excess coverage for bodily injuries regardless of the amount of the claim. In contrast, the excess clause applies in the context of claims relating to the boat/ boating equipment and the trailer only in the event the claims did not exceed the policy limits for those claims. The "Operating Other Boats" excess clause in the Coverage B boating liability section of the policy applies by its terms only to nonowned boats. The policy is not ambiguous.

¶42. Allstate next argues that the *pro rata* clause in the "other insurance" section of its policy[6] and the excess clause in the "other insurance" section of Continental's policy conflict and that, as such, the coverage liability should be apportioned *pro rata*. Allstate relies on this Court's holding that "the rule of repugnancy is applicable in cases in which 'other insurance' clauses or 'excessive coverage' clauses conflict. We have long followed the rule that the courts must enforce contracts as they are written, unless such enforcement is contrary to law or public policy." ***Allstate Ins. Co. v. Chicago Ins. Co.***, 676 So. 2d 271, 275 (Miss. 1996) (citing ***Berry v. Lamar Life Ins. Co.***, 165 Miss. 405, 142 So. 554 (1932)). The Court continued:

> Syllogistic folly awaits the unwary justice who seeks to harmonize the conflicting terms presented herein using traditional rules of construction. Public policy and common sense must step in when legal jargon fails. Where competing insurance policies each contain conflicting "other insurance" clauses or "excessive coverage" clauses, the clauses shall not be applied and

---

[6] Allstate's "other insurance" clause provides:  "[i]f more than one policy applies on a primary basis to an accident involving **your insured auto**, **we** will bear our proportionate share with other collectible liability insurance."

benefits under the policies shall instead be pro rated according to the coverage limits of each policy.

*Allstate*, 676 So. 2d at 275.

¶43.    In *Allstate*, Allstate provided an insurance policy to a drug store; the policy covered the store's employees and contained an "other insurance" clause which provided that, in the event other insurance covered a loss, it would "pay the amount of loss that is left after the full amount available after the other insurance has been paid." *Id.* at 273. Allstate's policy also contained a provision that "if there is other insurance that specifically applies **only** in excess of this policy, this policy will be primary to that excess insurance." *Id.* (emphasis in original). Chigaco provided professional liability insurance to the pharmacist who owned the drug store. *Id.* The Chicago policy's "other insurance" clause provided that "[i]f there is other valid insurance (whether primary, excess, contingent, or self-insurance) which may apply against a loss or claim covered by this policy, the insurance provided hereunder shall be deemed excess insurance over and above the applicable limit of all other insurance or self-insurance." *Id.*

¶44.    A wrongful death action filed against the pharmacist precipitated a declaratory judgment action filed by Allstate. *Id.* at 272-73. The trial court ruled that Allstate's policy provided primary coverage and that Chicago's policy provided excess coverage. *Id.* at 274. This Court reversed and remanded, finding that both clauses provided excess coverage and that "each insurer has attempted to limit its respective liability and coordinate its insurance with the other policy" and that "[i]n so doing, both Allstate's and Chicago's 'other insurance'

21

clauses come into conflict." *Id.* The Court observed that, "[s]tanding alone, each policy would provide primary coverage." *Id.*

¶45. This Court held that, because "[b]oth parties are, in effect, arguing that 'your excess exceeds my excess,'" the rule of repugnancy applied such that it found "the conflicting clauses in the instant case to be mutually repugnant . . . ." *Id.* at 275. It therefore reversed the trial court's decision and remanded "for a determination of the pro rata responsibilities of each party to this proceeding." *Id.*

¶46. Allstate states that:

> Nowhere in the *Chicago Insurance* opinion, or any other opinion located by Allstate, does the Mississippi Supreme Court expressly hold that an excess clause trumps a pro-rata clause . . . and in fact, the Court was faced with pro-rata and excess clauses in the Chicago Insurance Company case, and nonetheless held that any conflict in the clauses voids them and results in a pro-rata allocation.

(Emphasis in original.) But this Court specifically has held that "where an excess clause is in conflict with . . . a prorata clause in the other policy, the excess clause ordinarily would be given full effect." *Larson*, 485 So. 2d at 1073 (quoting *Chappell*, 246 So. 2d at 503).

¶47. And the cases in which this Court and the Mississippi Court of Appeals have applied the rule of repugnancy have, as in *Allstate*, dealt with provisions which would, in effect, altogether shift the coverage burden to the other carrier. *Compare Chappell*, 246 So. 2d at 504 (two escape clauses invalidated as "repugnant and nugatory"); *Titan Indem. Co. v. Am. Justice Reciprocal*, 758 So. 2d 1037, 1042 (Miss. Ct. App. 2000) ("This Court can discover no compelling reason, on the facts of this case, to do anything other than treat these two clauses, each having the purpose of shifting what otherwise would be primary coverage of

22

a claim of the other carrier, as mutually repugnant and simply disregard them both"), *with U.S. Fid. & Guar. Co. v. John Deere Ins. Co.*, 830 So. 2d 1145, 1148 (Miss. 2002) ("[W]hile the 'other insurance' clauses are identical, they do not conflict. The 'other insurance' clause simply establishes the order of priority of payments.").

¶48.    Federal authority applying Mississippi law takes a similar approach. *Compare Farmers Ins. Exch.*, 907 F. Supp. at 238 (Because an excess clause prevails over a *pro rata* clause, "[c]onsistent with this majority rule, this court concludes that Farmers'[s] coverage would not be implicated until Hartford expended its policy limits."); *Hill v. Gen. Ins. Co. of Am.*, 456 F. Supp. 2d 757 (N.D. Miss. 2006) (Court declined to invalidate "other insurance" clauses as "mutually repugnant as a matter of equity" because the "other insurance" clauses did not, if enforced, leave the insured without any coverage); *with Cont'l Cas. Co. v. Coregis Ins. Co.*, 213 F. Supp. 2d 673 (S.D. Miss. 2002) (Court invalidated "other insurance" clauses as mutually repugnant because, though Continental's "other insurance" clause provided for proration, it actually was an excess clause and, therefore, it was in conflict with Coregis's excess clause).

¶49.    The "other insurance" clauses in Allstate's and Continental's respective policies do not conflict. The Allstate policy's "other insurance" clause is not triggered, since Continental's policy does not provide "other collectible liability insurance." On the contrary, the Continental policy's "other insurance" clause provides that where "any other available insurance" would "apply in the absence of this policy," the Continental coverage applies as

23

excess coverage. And while each policy would provide primary coverage[7] standing alone, the "other insurance" provisions of the respective policies do not have the effect of cancelling each other out. Rather, because Allstate provides "other available insurance" applicable "in the absence of [the Continental] policy," Continental's excess provision controls. Such a reading is consistent with this Court's jurisprudence. *See **Larson***, 485 So. 2d at 1073 (quoting ***Chappell***, 246 So. 2d at 503).

¶50.    Allstate argues finally that because "Allstate and Continental do not insure the same property for the same risk," the respective "other insurance clauses need not be considered." It continues: "Allstate provides no coverage for the boat and Continental provides no coverage for the truck,[;]" therefore "[t]he risks associated with insuring a boat on the water and a truck on the road are . . . far different."

¶51.    Allstate cites a case from the United States Court of Appeals for the Fifth Circuit holding that "[u]nder Texas law, '[t]he provisions of an "other insurance" clause apply only

---

[7] Allstate argues that "the policies are both primary and provide coverage on a pro-rata basis." Though this Court has observed that two policies may be primary in the absence of the other, Allstate cites no authority for the proposition that two insurers can provide concurrent primary coverage and we find no Mississippi case law to support such a proposition. *See **Allstate***, 676 So. 2d at 274 ("[s]tanding alone, each policy would provide primary coverage."). Allstate's argument remains that *Continental* provided primary coverage:

> As the Court should note from the undisputed facts, Greg Peters first reported this incident to Continental and not to Allstate until many months later. This is because the obvious conclusion to Mr. Peters, and anyone else looking at the issue neutrally, was that the policy he purchased to cover his boat would provide primary coverage to him when the boat was involved in a loss.

As discussed above, the truck and trailer also were involved.

24

when the "other" insurance covers the same property and interest therein against the same risk in favor of the same party.'" ***United Nat'l Ins. Co. v. Mundell Terminal Servs., Inc.***, 740 F.3d 1022, 1028 (5th Cir. 2014) (internal citation omitted). But, as Continental responds, "this case involves a claim for bodily injury" and "both insurers provide coverage for bodily injury arising from the use of their respective vehicles." Accordingly, Allstate's argument is without merit.

¶52.    Having found that Allstate is the primary insurer and Continental is the excess insurer, we reverse the judgment of the Circuit Court of the First Judicial District of Harrison County and render a judgment in favor of Continental in the amount of $20,000.

> **2.      Whether the circuit court properly granted summary judgment to Allstate on Continental's claim that it was entitled to recover the defense costs and expenses incurred after tendering defense to Allstate.**

¶53.    Continental maintains on appeal that it is entitled to recover $20,245.51 in defense costs and expenses incurred following its tender of defense to Allstate. Continental claims that after it, as excess insurer, tendered defense of Williams's claim to Allstate, the primary insurer, "Allstate took conflicting positions regarding priority of coverage and did not appear to be mounting a defense," leaving Continental with "no choice but to continue to expend considerable resources investigating Mr. Williams's claim and defending Mr. Peters."

¶54.    "The liability insurance company has an absolute duty to defend a complaint which contains allegations covered by the language of the policy . . . ." ***Moeller v. Am. Guar. & Liab. Ins. Co.***, 707 So. 2d 1062, 1069 (Miss. 1996). Further, "[i]n Mississippi, an insurance company's duty to defend its insureds derives neither from common law nor statute, but

25

rather from the provisions of its policy, that is, its insurance contract with its insured." ***Baker Donelson Bearman & Caldwell, P.C. v. Muirhead***, 920 So. 2d 440, 450 (Miss. 2006). "An insurance company's duty to defend its insured is triggered when it becomes aware that a complaint has been filed which contains reasonable, plausible allegations of conduct covered by the policy." ***Id.*** at 451. Allstate responds that it was under no obligation to defend Peters, since Williams never filed a lawsuit.

¶55. Continental cites various cases in support of its argument. In ***Guidant***, for instance, this Court held that Indemnity, the excess insurer, "should be entitled to all reasonable, necessary expenses incurred in the course of defending the fire department and Marshall County, but only those expenses incurred after demand was made on Guidant to provide a defense." ***Guidant***, 13 So. 3d at 1282.

¶56. Likewise, in ***State Farm Mutual Auto Insurance Company v. Commercial Union Insurance Company***, 394 So. 2d 890, 891 (Miss. 1981), this Court considered State Farm's suit on a bill of discovery in chancery court against Commercial Union in which State Farm sought "to recover attorney's fees incurred in the defense of two circuit court lawsuits which arose out of an automobile-train collision." This Court ultimately held that, "[b]ecause Commercial Union had a clear duty to defend, which duty State Farm as the secondary carrier fulfilled upon Commercial Union's failure to do so, it follows State Farm is allowed to all reasonable and necessary expenses in fulfilling Commercial Union's obligations." ***Id.*** at 894.

¶57. Continental also cites ***Liberty Mutual Insurance Co. v. U.S. Fidelity and Guaranty Ins. Co.***, 756 F. Supp. 953, 954 (S.D. Miss. 1990), in which Liberty Mutual sued USF&G

for reimbursement of defense costs after having defended two state court actions. The United States District Court for the Southern District of Mississippi ruled that "Mississippi law is clear that if an insurer breaches a duty to defend and the defense is assumed by a second insurer, the second insurer may recover that portion of the reasonable and necessary attorney's fees and settlement payments which the first insurer was obligated to pay." *Id.* at 957.

¶58.    But, as Allstate responds, each case that Continental cites involves insurers seeking defense costs after having had to defend a lawsuit. Continental argues, however, that "Mississippi state and federal courts have found a duty to defend even where no underlying complaint has been filed." It cites *State Farm Mutual Automobile Insurance Company v. Allstate Insurance Company*, 255 So. 2d 667, 668 (Miss. 1971), in which this Court considered State Farm's "bill of complaint for discovery and contribution against Allstate Insurance Company, on the equity side of the County Court of the First Judicial District of Hinds County." Allstate and State Farm both insured a vehicle that was involved in a rear-end collision with a vehicle owned by Hertz Corporation. *Id.* State Farm investigated and, finding its insured to have been liable, "made demand on Allstate to contribute to a settlement of the claims, which demand was refused by Allstate." *Id.* This Court held that "State Farm [had] acted for [the insured's], State Farm's, and Allstate's best interests in settling these claims out-of-court." *Id.* at 669. Because Allstate breached "its contract with the insured by refusing to defend him in any manner," this Court allowed State Farm's claims

27

against Allstate for "one-half of the $2,380.00 paid by State Farm in total settlement of all claims" to proceed. *Id.* at 668-69.

¶59. In the present case, however, Continental does not claim that Allstate refused to contribute to the settlement. At mediation, Allstate paid $230,000 toward the total settlement of $460,000. And, contrary to Continental's argument, *State Farm* stands only for the proposition that an insurer which investigates and settles a claim may seek contribution from a co-insurer toward the settlement. That case does not address whether the investigating insurer is entitled to recover the costs of the investigation.

¶60. Continental also cites a case in which this Court held that "[w]ith a deductible, . . . the insurer usually has a duty to defend upon receipt of notice of the claim." *S. Healthcare Servs. Inc. v. Lloyd's of London*, 110 So. 3d 735, 749 (Miss. 2013). But there, this Court affirmed a grant of summary judgment to insurers because the insurers had not denied a defense to the insureds; "[r]ather, the Insurers required the Insureds to pay the $250,000 deductible amount, which included defense costs, as required by the policy." *Id.* at 752.

¶61. Continental also cites this Court's decision in *Murphree v. Federal Insurance Co.,* 707 So. 2d 523, 531 (Miss. 1997), for the proposition that "it is well settled under Mississippi law that an insurance company has a duty to investigate promptly and adequately an insured's claim . . . ." However, that case involved an allegation of bad faith refusal to defend; and this Court observed that "a plaintiff's burden in proving a claim for bad faith refusal goes beyond merely demonstrating that the investigation was negligent." *Id.* While a duty to investigate may arise, this Court did not hold that an insurer has a pre-suit duty to defend. Moreover, as

28

Allstate observes, *Murphree* involved an insured seeking defense costs pursuant to an insurance policy, not an excess insurer's seeking to recover defense costs from a primary insurer.

¶62.    Continental also cites federal cases. But the issues before the United States District Court for the Southern District of Mississippi in both *Mesa Underwriters Specialty Insurance Co. v. Daffy's on River, Inc.*, 2014 WL 5025850 (S.D. Miss. Oct. 8, 2014), and *QBE Insurance v. McFarland*, 2011 WL 3625308 (S.D. Miss. Aug. 17, 2011), did not involve an excess insurer's seeking pre-suit defense costs from a primary insurer. Rather, both cases dealt with the question of whether a declaratory judgment action by an insurer was ripe despite only a notice of claim's having been presented, and no complaint's having been filed. *Mesa*, 2014 WL 5025850, at *2; *McFarland*, 2011 WL 3625308, at 2. Continental also is correct that the United States Court of Appeals for the Fifth Circuit has observed that, "'[u]nder Mississippi law, insurers have a duty "to perform a prompt and adequate investigation and make a reasonable, good faith decision based on that investigation". . . .'" *James v. State Farm Mut. Auto. Ins. Co.*, 743 F.3d 65, 70 (5th Cir. 2014) (quoting *Broussard v. State Farm Fire and Cas. Co.*, 523 F.3d 618, 627-28 (5th Cir. 2008) (quoting *Liberty Mut. Ins. Co. v. McKneely*, 862 So. 2d 530, 535 (Miss. 2003))). But *James* involved an insured's suit against State Farm for a nearly thirty-month delay in tendering uninsured motorist policy limits. *James*, 743 F.3d at 66.

¶63.    Under Mississippi precedent, Allstate, the primary insurer, did not have a duty to defend Peters because Williams never filed a lawsuit.

29

¶64. In addition to claiming that Allstate had a duty to defend, Continental argues that Allstate's actions amounted to a refusal to defend. Continental cites *Sarnafil, Inc. v. Peerless Insurance Company*, 609 N.E.2d 1234 (Mass. App. Ct. 1993). In that case, the Appeals Court of Massachusetts determined that fact questions existed as to Sarnafil's claim against Peerless Insurance Company for defense costs Sarnafil had incurred in an arbitration between it and another company. *Id.* at 1235. The question of fact allowing the case to survive summary judgment was whether Peerless's communication of its decision to deny coverage was prompt and whether it had conducted any investigation of the facts, despite its promise "to conduct a prompt and diligent one." *Id.* at 1238. That court found that the arbitration, "the cost of defending which is being sought from Peerless, *was* the equivalent of a suit filed against Sarnafil." *Id.* at 1239 (emphasis in original). But the present case does not involve the alleged wrongful denial by an insurer of a defense to an insured. And *Sarnafil* does not address an excess insurance carrier's allegation of wrongful denial of defense against a primary insurance carrier.

¶65. Continental claims that "Allstate took conflicting positions, stated that it would not defend Mr. Peters until a lawsuit was formally commenced, and conducted virtually no investigation." After Continental took the position that, under the respective insurance policies, "the Allstate policy provides primary coverage and the Continental policy is excess," Allstate argued in response, as it argues now, that the language of the conflicting insurance policies need not be parsed, but that "any conflict in the two policies would result

30

in both policies being considered primary and sharing on a pro rata basis."[8] (Emphasis in original.)

¶66.   Continental claims that Allstate "made a number of statements to Continental indicating that Allstate was not defending the claim asserted against Mr. Peters." Continental wrote to Allstate that Continental "is currently providing a defense to Mr. Peters. That defense as well as primary indemnity coverage appears to be the responsibility of Mr. Peters'[s] automobile carrier, Allstate, and we request that you revisit your position." Allstate responded that:

> Your letter also indicates that defense costs are being incurred but Allstate has not been placed on notice of a lawsuit and Mr. Peters has not reported being served with a complaint. If there has in fact been a lawsuit filed, please provide me with a copy of the same, as there are defenses to the claims being made by Mr. Williams that should be asserted, particularly being Williams'[s] own comparative negligence.

¶67.   Allstate's counsel wrote to Continental's counsel that:

> I do not believe that Allstate will agree to Jed Malish as defense counsel unless we have an agreement on the front end about allocation of costs. What Allstate doesn't want is someone running up a huge unnecessary bill (pretty typical for most New Orleans lawyers I have been involved with) and then turning it over to them for full payment on a theory that Allstate was 100% responsible for it. I will have to confirm with Allstate, but based on my last conversation with them, I believe that they will be willing to pick up the entire costs of the defense when a suit is filed and have the issue of pro rata allocation be decided after the fact, if necessary . . . .

---

[8] Allstate stated that "[i]n all likelihood and based on the facts as we understand them the more probable result is that the Allstate policy would be determined to be excess, but to avoid a long drawn out battle, Allstate remains willing to share in the costs on a pro rata basis." But that argument was an alternative one, and Allstate continued: If this matter is litigated, however, Allstate will take the position that as the insurer for the instrumentality directly related to the loss [Continental Casualty] should provide primary coverage."

Another letter from Allstate's counsel to Continental's indicated that:

> Allstate does not dispute that they are a primary insurer with a duty to defend but it is their position that Continental is also primary, since they insured the boat that was involved in the incident. If Continental disputes that position and believes that they are excess only, that is no problem and this can be fought at a later date, but as an excess carrier, Continental does not get to choose the way that the case is defended or by whom.

¶68. The evidence adduced by Continental does not support its claim that Allstate refused to defend the claims. Allstate took the position in negotiations with Continental about their respective coverage positions that Allstate, as primary insurer, would defend Peters if and when a lawsuit was filed against him. Absent the filing of a lawsuit, Allstate had no obligation to defend Peters.

¶69. Continental argues, however, that it "gathered records, prepared damage evaluations, engaged in negotiations, hired an independent physician, and furthered the defense of Mr. Peters in a number of other ways." Continental continues that "[t]hroughout this post-tender/pre-mediation period, Allstate and Continental requested the other's investigative materials." Continental claims to have "provided substantial materials but received virtually nothing from Allstate, indicating that Allstate had none of its own to share." Allstate responds that it "took statements, gathered medical records and began negotiating with counsel for Mr. Williams but this was simply part of their routine investigation."

¶70. The record is devoid of evidence that Continental conducted a thorough investigation while Allstate did nothing. Continental's claim that it received "virtually nothing from Allstate" is not supported by the record. Accordingly, viewing the facts in the light most

favorable to Continental, the nonmoving party, we affirm the judgment of the Circuit Court

of the First Judicial District of Harrison County granting summary judgment to Allstate.

> **3. ON CROSS-APPEAL: Whether the circuit court erred by failing to sanction Continental for making a frivolous claim for defense costs and expenses.**

¶71. Allstate sought sanctions pursuant to Mississippi Rule of Civil Procedure 11 and the

Litigation Accountability Act, Mississippi Code Section 11-55-3 *et seq.*, including

"reasonable fees and expenses incurred by Allstate in defending" Continental's claims that

Allstate had failed to defend. Allstate cross-appeals the circuit court's denial of sanctions.

¶72. Mississippi Rule of Civil Procedure 11(b) provides, in pertinent part, that:

> If any party files a motion or pleading which, in the opinion of the court, is frivolous or is filed for the purpose of harassment or delay, the court may order such a party or his attorney, or both, to pay to the opposing party or parties the reasonable expenses incurred by such other parties and by their attorneys, including reasonable attorneys' fees.

Miss. R. Civ. P. 11(b). Likewise, the Mississippi Litigation Accountability Act provides, in

pertinent part, the following:

> [I]n any civil action commenced or appealed in any court of record in this state, the court shall award, as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorney's fees and costs against any party or attorney if the court, upon the motion of any party or on its own motion, finds that an attorney or party brought an action, or asserted any claim or defense, that is without substantial justification, or that the action, or any claim or defense asserted, was interposed for delay or harassment, or if it finds that an attorney or party unnecessarily expanded the proceedings by other improper conduct including, but not limited to, abuse of discovery procedures available under the Mississippi Rules of Civil Procedure.

Miss. Code Ann. § 11-55-5(1) (Rev. 2012). The Act defines "[w]ithout substantial

justification" as "frivolous, groundless in fact or in law, or vexation, as determined by the

court." Miss. Code Ann. § 11-55-3(a) (Rev. 2012). The circuit court found that sanctions were not warranted because Continental's claims were not frivolous and had not been "interposed for delay or harassment" and declined to find that "an attorney or party unnecessarily expanded the proceedings by other improper conduct."

¶73. This Court has held that "[t]he decision to award monetary sanctions is left to the discretion of the trial court." *Hampton v. Blackmon*, 145 So. 3d 632, 634 (Miss. 2014) (citing *McNeese v. McNeese*, 129 So. 3d 125, 130 (Miss. 2013)). A judgment denying sanctions is reviewed for an abuse of discretion. *Hampton*, 145 So. 3d at 634 (citing *In re Spencer*, 985 So. 2d 330, 337 (Miss. 2008)). "'In the absence of a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of relevant factors, the judgment of the court's imposition of sanctions will be affirmed.'" *Hampton*, 145 So. 3d at 634 (quoting *Spencer*, 985 So. 2d at 337).

¶74. "A claim is frivolous when the claimant has no hope of success." *Hampton*, 145 So. 3d at 634 (citing *Leaf River Forest Prods. v. Deakle*, 661 So. 2d 188, 196-97 (Miss. 1995)). "Thus, sanctions would be inappropriate if the plaintiff had some chance of success." *Hampton*, 145 So. 3d at 635 (citing *Choctaw, Inc. v. Campbell-Cherry-Harrison-Davis and Dove*, 965 So. 2d 1041, 1044 (Miss. 2007)). "'Though a case be weak or "light-headed," that is not sufficient to label it frivolous.'" *Anderson v. B.H. Acquisition, Inc.*, 771 So. 2d 914, 922 (Miss. 2000) (quoting *Scruggs v. Saterfiel*, 693 So. 2d 924, 927 (Miss. 1997)). This Court declined to hold that a claim had been frivolous, though the plaintiff did not prevail

on appeal: "[a]lthough Anderson's claim has proven to be unsuccessful, we cannot say that the claim was frivolous or that Anderson had no hope of success." *Anderson*, 771 So. 2d at 922. Further, "[t]he fact that a case is weak is not sufficient to find that it was brought to harass." *City of Madison v. Bryan*, 763 So. 2d 162, 167 (Miss. 2000) (citing *Brown v. Hartford Ins. Co.*, 606 So. 2d 122, 127 (Miss. 1992)).

¶75. Allstate cites *Ashley Healthcare Plan v. Dillard*, 177 So. 3d 175 (Miss. 2015), to argue that "the Mississippi Supreme Court has very recently affirmed an award of sanctions against a party who engaged in similar conduct as that of Continental in the present case." But in *Dillard*, this Court affirmed the imposition of sanctions against Ashley Healthcare Plan, which the Court found to have removed the case to federal court frivolously. *Id.* at 189. This Court observed that:

> [A]ll precedent which governs this case, both from the Northern District of Mississippi and from the Mississippi Supreme Court, holds that ERISA does not preempt the chancery court's duty to review minors' settlements. In the absence of valid contrary or intervening authority, this area of the law was well settled when the plan undertook removal and had been for more than two decades.

*Id.*

¶76. Here, while the cases cited by Continental in the trial court may have been distinguishable, Continental's position was neither frivolous nor "interposed for delay or harassment." It cannot be said therefore that the trial court abused its discretion in declining to award sanctions to Allstate. Accordingly, we affirm the judgment of the Circuit Court of the First Judicial District of Harrison County denying sanctions to Allstate.

## CONCLUSION

¶77.  Because Allstate is the primary insurer and Continental is the excess insurer, we reverse the judgment of the Circuit Court of the First Judicial District of Harrison County and render a judgment in favor of Continental in the amount of $20,000. As to Continental's claim that it is entitled to defense costs and expenses it incurred in investigating the underlying insurance claims, we affirm the judgment of the Circuit Court of the First Judicial District of Harrison County granting summary judgment to Allstate. Finally, this Court affirms the denial of sanctions to Allstate.

¶78.  **ON DIRECT APPEAL: AFFIRMED IN PART AND REVERSED AND RENDERED IN PART. ON CROSS-APPEAL: AFFIRMED.**

**WALLER, C.J., DICKINSON, P.J., KING AND COLEMAN, JJ., CONCUR. RANDOLPH, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY MAXWELL, BEAM AND CHAMBERLIN, JJ.**

**RANDOLPH, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶79.  It is irrefutable that the underlying claim made by Williams against Peters was precipitated by Peters's operating the Continental insured boat in reverse at a time when the mooring line remained secured between the boat and the wench on the trailer. If the boat had not reversed its course, the handle of the wench would not have recoiled, causing injury to Williams.

¶80.  It is undisputed that Continental provided the only coverage for boating liability protection. Similarly, Allstate provided the only auto liability applicable to this accident. Continental's policy reads that it was specifically designed and intended to provide coverage

36

for the boat involved. Peters had no other liability coverage on his boat. Allstate's policy was specifically designed and intended to provide coverage for his truck. Its coverage was extended to include the trailer, which was attached to the truck. Had the trailer been unattached, it would not have liability coverage under either policy.

¶81.    "It is well-established law in Mississippi that a liability insurance policy covering the vehicle[9] involved in an accident provides primary coverage." *State Farm Mut. Auto. Ins. Co. v. Universal Underwriters Ins. Co.*, 797 So. 2d 981, 983 (Miss. 2001). *State Farm* instructs us that *both* the boat liability policy and the truck liability policy provide primary coverage. Furthermore, "the policy of the owner of the vehicle involved in the accident is ordinarily considered to be the 'primary policy.'" *Travelers Indem. Co. v. Chappell*, 246 So. 2d 498, 505-06 (Miss. 1971). *Chappell* instructs that both policies are primary, for Peters is the policy owner for *both* vehicles involved in the accident. Thus the trial court's conclusion that both are primary, i.e. co-primary, does not conflict with our established jurisprudence.

¶82.    Not a single case cited by Continental grants Continental a superior position *vis a vis* Allstate. Since both policies provided liability coverage for vehicles owned by Peters and involved in the accident, the respective policies are co-primary.[10] We have never specifically

---

[9] Not to be confused with Allstate's limited definition for policy purposes, a boat can also be a vehicle. Webster defines "vehicle" as "a devise, as a motor vehicle or a piece of mechanized equipment [boat], for transporting passengers, goods, or apparatus." *Vehicle*, Webster's II: New College Dictionary, 1223 (2001).

[10] Webster defines "co" as "with or together: joint; to the same extent or degree." *Co*, Webster's II: New College Dictionary 213 (2001).

addressed "co-primary" policies. *State Farm* and *Chappell* dictate the only determination that we can make. Both policies are primary.

¶83.    The majority opinion discusses *Guidant Mutual Insurance Company v. Indemnity Insurance Company of North America*, 13 So. 3d 1270 (Miss. 2009), at length (*see* Maj. Op. ¶¶ 27-30), but *Guidant* offers little instruction. *Guidant* involved two policies on one vehicle. *Guidant*, 13 So. 3 at 1273. The majority recognizes that *Guidant* is factually dissimilar from today's case. Not only is *Guidant* dissimilar, but the other cases relied on by the majority are as well.[11]  Today's case presents a case of first impression.  We have located no case on point determining excess over pro rata, where one person procured two liability policies on two owned vehicles involved in the same accident.

¶84.    Although these policies cover separate property and interests and insure against separate risks, Continental insists that its policy is excess and argues that *its* policy dictates the result. Continental further aruges that the terms of its policy elevate *its* boating liability policy to excess over an auto liability policy and all other insurance of any nature. Continental has conflated distinctive liability coverages to support its argument that *its* terms eliminate any primary liability exposure.

### *Analysis of Policies*

---

[11] Indeed, cases cited by the majority have beneficial language, but not one case dictates today's holding; however, *Continental Casualty Company v. Coregis Insurance Company*, 213 F. Supp. 2d 673 (S.D. Miss. 2002), reaches a similar conclusion, addressing "overlapping," "dual," and "concurrent" coverage. *Coregis*, 213 F. Supp. 2d at 675, 677, 679. *Coregis* also cited, with approval, *Chappell*, as our State's controlling law and declaring pro rata as the default position.  *See* Appendix.

¶85. A detailed examination of the two policies reveals one is for a boat,[12] insured by Continental, and the other is for a truck and attached trailer, insured by Allstate. Continental contends that the language of its boating liability policy allows it to bypass its primary liability responsibility for the *boat* it insured, relegating itself to an excess position. Continental makes this rather novel argument despite being the *only* boating liability carrier. *See* Coverage B. Also included in Continental's boat policy was a medical payment provision, from which Williams received payments. *See* Coverage D. However, Continental seeks no credit for this payment.

¶86. Not surprisingly, Allstate acknowledges that its auto liability policy provides primary coverage for an auto accident involving the insured auto.[13]

### 1. Liability Coverage

#### a. Continental Policy

¶87. Peters's 2003 Regulator Boat was insured by Continental through a "Boat U.S. Marine Insurance Program Yacht Policy" with a $300,000 boating liability limit. The purpose of the boat policy was not only to provide protection to Peters in the event of an accident involving his boat, but it provided protection to Peters in the event of an accident involving any boat.

---

[12] The boat policy language reads in pertinent part that:

The policy you are holding is designed by and especially for a recreational boat owner like you. This policy booklet explains, in plain language, what you as the policyholder can expect the insurance company to provide in the event of an accident involving your boat.

[13] Although the truck and trailer were not being operated at the time of the accident, its auto liability coverage was triggered by the "loading . . . of an insured [vehicle]."

39

¶88. Under Coverage B, "Boating Liability (Protection & Indemnity), Continental has an absolute duty to:

> pay damages and any costs assessed against [Peters] up to that amount [listed on the Declarations page] for any claim or suit covered under this policy for bodily injury or property damage for which any insured becomes legally liable through ownership, maintenance or use of the insured boat.[14]

¶89. "To the extent that conflict may appear, specific provisions . . . control over general provisions." ***Arant v. Hubbard***, 824 So. 2d 611, 616 (Miss. 2002) (citations omitted). A specific provision addressing excess coverage is found in the subsection entitled "Operating Other Boats." As to *other boats*, Continental will:

> provide this boating liability coverage to the named insured and any family member subject to the other provisions of this policy, while operating another boat with the permission of its owner. However, we do not cover loss or damage to the other boat or its boating equipment. *If there is any other available insurance, we will provide coverage only as excess over such insurance.*

This specific, excess provision applies when Peters operates a nonowned boat with the owner's permission, comparable to a ***State Farm*** analysis.[15] In today's case, there is no other available insurance for boating liability. This specific, excess clause does not magically turn Continental's liability policy into an excess liability policy, shifting primary responsibility to Allstate. Can anyone seriously contest, under the facts of today's case, that liability coverage rests upon each insurer?

---

[14] Could the insurer's intent be any clearer? *See* Maj. Op. ¶ 31.

[15] Insurance coverage follows the vehicle.

¶90.    Peters's boat policy also provided coverage for fuel spills, Longshore & Harbor Workers' Compensation, and uninsured boaters, but it excluded *liability* coverage for "bodily injury or property damage arising out of the transportation of the boat or trailer on land. . . ." Continental has never insinuated that it waived this exclusion to extend liability coverage to the trailer owned by Peters. Not once has Continental taken a position that there was other insurance available for boating liability.

### b.    Allstate Policy

¶91.    Conversely, under the Allstate policy, you will not find "boat" defined, as this policy covers neither boats or boating liability claims. You will find that "auto" is defined as a "private passenger land motor vehicle, with at least four wheels designed for use on public roads." The policy specifically provides that "[a]n auto and attached trailer are considered one auto." The policy also defines a "motor vehicle" as "a land motor vehicle designed for use on public roads." Pursuant to its Liability Coverage section, Allstate "will pay damages which an insured person is legally obligated to pay. . . . Under these coverages, your policy protects an insured person from liability for damages arising out of ownership, maintenance or use, loading or unloading of an insured auto."[16] [17]

¶92.    A reading of each policy reveals that Allstate did not insure Peters for an accident involving his boat, and Continental did not insure Peters for an accident involving his truck.

_____

[16] *See* Maj. Op. ¶ 31.

[17] Compare to ¶ 12.

41

Neither policy provides coverage for the other's proscribed liability. Each policy provides liability coverage, albeit for different vehicles and for different risks.

¶93.    By applying the specific policies of each insurer, it is clear that Continental intended to and did contract with Peters to provide liability coverage for a boating accident and Allstate intended to and did contract with Peters to provide liability coverage for an automobile accident.[18]

### 2.    "Other Insurance" Clauses

### a.    Continental Policy

¶94.    In the "*General* Conditions" section of the policy, under the "other insurance" subsection, we find the following:

> If there is any other available insurance that *would apply in the absence of this policy*, this insurance shall apply as excess over the other insurance, but the combined amount shall not exceed the limits of this policy for any loss under Coverage A, Boat and Boating Equipment, or Coverage E, Boat Trailer.

(Emphasis added.) This particular subsection elevates Continental's policy to an excess policy only under Coverage A (loss of boat) and Coverage E (loss of trailer), not Coverage B, i.e., boating liability coverage. Coverages A and E are not at issue in today's case and do not affect our decision.[19] However, Coverage B is applicable to today's case. For instance, this clause would have applied if there had been separate coverage on the boat and the boat had been stolen. To prevent double payment, Continental's policy would pay only in excess

---

[18] *See* Maj. Op. ¶ 31.

[19] Controlling, specific conditions addressing excess are found in ¶ 90, *supra*.

over the other available policy, up to the limits of the loss of the boat. The same would be true for the trailer.

¶95.    Under Coverage D, regarding Medical Payments, the policy specifically reads, "If there are any other available medical benefits to the injured person, this coverage will be *excess over such other insurance*." As the majority stated, Continental paid Williams $1,000, which was Peters's policy limit for medical payments, plus a $25,000 advance to be deducted from the boating liability coverage. Williams's own medical health insurance carrier paid an uncertain amount.[20] But at no time has Continental sought to obtain a credit or setoff of the medical benefits paid by Williams's health care insurer. Nor has Continental attempted to expand this clause to include Coverage D, despite its expansive, "other insurance" clause.

### b.    *Allstate Policy*

¶96.    There is quite a difference in Allstate's *general* "other insurance" clause, which reads:

> If more than one policy applies on a primary basis to an *accident involving your insured auto*, we will bear our proportionate share with other collectible *liability* insurance.

(Emphasis added.) Allstate's general "other insurance" clause does not apply to today's case because there was no other collectible liability insurance for the insured auto.[21]

---

[20] The record reflects that Williams's health insurance paid for surgeries, but the amount paid was not provided.

[21] The majority also relies on **Blue Cross & Blue Shield of Mississippi, Inc. v. Larson**, a health-care-provider dispute over coordination-of-benefits clauses, which are utilized to avoid duplicative payments (not at issue in today's case), for the principle that liability is governed by the "*intent of the insurers as manifested by the terms of the policies which they have issued*." **Larson**, 485 So. 2d 1071, 1074 (Miss. 1986). Although the majority acknowledges that the "other insurance" clauses at issue today conflict, the majority seeks refuge from **Larson**, a nonliability policy case, which stated that when

¶97.    Assuming *arguendo* if Continental's and Allstate's "other insurance" clauses were applicable to today's case, the clauses are contradictory and inconsistent with the other.[22] By virtue of these two clauses being in conflict with the other, our caselaw directs us to apply neither. *See Chappell*, 246 So. 2d 498; *Allstate Ins. Co. v. Chicago Ins. Co.*, 676 So. 2d 271 (Miss. 1996).[23]

¶98.    Continental argued that, pursuant to the "other insurance" language of the two policies, Continental should provide only excess coverage for Williams's injuries and would be responsible for indemnity payments only after Allstate had exhausted its $250,000 auto policy limits. Allstate took the position that both policies provide primary coverage and should provide coverage on a prorata basis. The trial court found that Continental was a co-primary insurer.

---

> an excess clause is in conflict with either an escape clause or a pro rate clause in the other policy, the excess clause *ordinarily* would be given full effect. The courts are thus attempting to give the full effect to the *intent* of the two policies to offer two different levels of coverage.

*Id.* at 1073 (emphasis added).  Today's case does not provide an "ordinary" set of facts, and the intent of each insurer is addressed in the policies. *See* ¶¶ 89-92, *supra*.

[22] Webster defines "repugnance" as "the relationship of contradictory terms: inconsistent." *Repugnance*, Webster's II: New College Dictionary, 942 (2001).

[23] The majority cites factually dissimilar cases which hold that excess clauses are superior to pro rata clauses. However, by the very nature of the clauses, an excess clause contradicts a pro rata clause and is thus repugnant. If clauses are repugnant, they must be rejected, leaving the policies as if the clauses were never included. *Chappell*, 246 So. 2d at 504; *Chicago Ins. Co.*, 676 So. 2d at 275. Once clauses are deemed to be repugnant, the insurers are liable for their proportionate share. *Id.*

44

¶99. Although *Chappell* does not reveal the origins of insurance for boats, it informs us that

> [t]he history of the liability of insurer "but for other insurance" clauses in insurance policies apparently came into existence in comprehensive fire, wind and property damage insurance policies in an effort to prevent the insured from obtaining double insurance on a single loss. *Cf.* ***Phoenix Insurance Co. v. Copeland***, 90 Ala. 386, 8 So. 48 (1890). The use of "other insurance" clauses in automobile accident policies began to appear in the courts of England in the early 1930's. ***Weddell, et al v. Road Transport and General Insurance Co., Ltd.***, (1932) 2 Kings Bench 563 (1931).

*Chappell*, *246 So. 2d* at 502. This Court noted that our sister states and courts have experienced great difficulty in establishing "an equitable method of determining limit of the liability of competing insurance companies to the end that the public interest of an insured has been often shunted aside in this battle of verbal specifics." ***Id.*** Courts first looked to the date of both policies and placed full liability on the policy which became effective first. ***Id.*** (citations omitted). The courts then shifted to a "prime tortfeasor theory," which placed full liability on the driver of the automobile rather than the owner. ***Id.*** at 502-03 (citations omitted). However, this theory was abandoned. ***Id.*** at 503 (citations omitted).

> The courts then, in an effort to give meaning to every possible conflicting phrase in "other insurance" clauses found in competing insurance policies, made an effort to recognize the "*specific over the general*." This was an attempt to distinguish between the relative specificity of the competing policies and to impose liability upon the insurer whose policy offers the most specific protection for, or most specific rejection of, the particular loss.

***Id.*** at 503 (citations omitted) (emphasis added). Finally, our sister states and courts recognized that the rules created were "bypassing the real purpose of insurance, that is to protect the insured against liability." ***Id.*** Giving full effect to conflicting escape clauses in

45

competing insurance policies allowed both insurers to avoid liability completely. *Id.* Courts now have refused to enforce the conflicting "other insurance" clauses. *Id.* The view most often accepted by courts is "when there is a conflict in the policies, . . . the two policies are indistinguishable in meaning and intent, (and therefore) one cannot rationally choose between them and must, therefore, be held to be mutually repugnant and must be disregarded." *Id.* at 504 (citations omitted). We should continue to follow this principle in the case *sub judice*.

¶100. In *Chappell*, this Court adopted the rule of our sister states and held that the two clauses at issue were "repugnant and nugatory, and that the two. . . clauses are not applicable, and that, therefore, both policies are liable under the judgment in favor of the appellee. . . ." *Id.* at 504.

¶101. The Court also looked to the problem of apportioning liability when the other clauses were not applicable. *Id.* at 504. Based on prior caselaw and the general rule that the owner of the vehicle involved in the accident is the primary policyholder, the majority held that the insurer of the vehicle involved in the accident was the primary policy. *Id.* at 505 (citing *Int'l Serv. Ins. Co. v. Ballard*, 216 So. 2d 535 (Miss. 1968)).

¶102. The pertinent principles which can be gleaned from *Chappell* are that (1) the true purpose of an insurance policy is to protect the insured from liability; (2) the owner of the vehicle(s) involved in the accident is (are) the primary policyholder(s); (3) conflicting "other insurance" clauses are deemed repugnant and are not applicable; and (4) once conflicting "other insurance" clauses are deemed inapplicable, each policy found liable is limited to its

stated coverage amount. Applying those principles to this case, since the policies at issue have conflicting "other insurance" clauses, then both policies should be primarily liable, up to their respective coverage limits.

¶103.  ***Chicago Insurance Company***[24] reaffirmed the "rule of repugnancy:"

> We hold that the rule of repugnancy is applicable in cases in which "other insurance" clauses or "excessive coverage" clauses conflict. We have long followed the rule that the courts must enforce contracts as they are written, unless such enforcement is contrary to law or public policy. ***Berry v. Lamar Life Ins. Co.***, 165 Miss. 405, 142 So. 445 (1932). Syllogistic folly awaits the unwary justice who seeks to harmonize the conflicting terms presented herein using traditional rules of construction. Public policy and common sense must step in when legal jargon fails. Where competing insurance policies each contain conflicting "other insurance" clauses or "excessive coverage" clauses, the clauses shall not be applied and benefits under the policies shall instead be pro rated according to the coverage limits of each policy.

***Chicago Ins. Co.***, 676 So. 2d at 275. In ***Chicago Insurance Co.***, this Court stated that "[I]t is central to our analysis that each policy, absent the other, would have provided primary coverage." ***Id.*** at n.2. I rest my case.

¶104.  With all due respect to my esteemed colleague and majority author, I would affirm the trial court's judgment, which found:

> Having reviewed the applicable law as well as the language contained in the policies against the undisputed facts, the court determines that Continental is a co-primary insurer and should share in the loss with Allstate on a pro rata basis.

## APPENDIX

---

[24] The distinction in ***Chicago Insurance Company*** is that both insurers tried to "pass the buck" and hold the other first to avoid primary coverage. In this case, only Continental attempts to avoid its agreement to provide primary liability coverage for a boating accident, compared to Allstate correctly acknowledging its duty, by prorating damages, as the insurers were coprimaries.

| Case Name | Distinction |
|---|---|
| ***Guidant Mut. Ins. Co. v. Indem. Ins. Co. of N. Am.***, 13 So. 3d 1270 (Miss. 2009). | Involved two auto policies covering the same vehicle. |
| ***Blue Cross & Blue Shield of Mississippi, Inc. v. Larson***, 485 So. 2d 1071 (Miss. 1986). | A nonliability insurance case, involving coordination-of-benefit clauses for medical bills between a health-care insurer and its insured member of an employer medical expense trust (to prevent double payment). |
| ***Allstate Ins. Co. v. Chicago Ins. Co.***, 676 So. 2d 271 (Miss. 1996). | Involved two professional liability policies: one on the pharmacy and another for the pharmacist. |
| ***U.S. Fid. & Guar. Co. v. John Deere Ins. Co.***, 830 So. 2d 1145 (Miss. 2002). | Involved uninsured-motorist benefits of two auto insurance policies. |
| ***Farmers Ins. Exch. v. Hartford Cas. Ins. Co.***, 907 F. Supp. 234 (S.D. Miss. 1995). | Involved a personal auto liability policy and a personal umbrella policy (which is excess by definition and requires underlying coverage for everything covered). |
| ***Hill v. Gen. Ins. Co. of Am.***, 456 F. Supp. 2d 757 (N.D. Miss. 2006). | Involved two fire insurance policies covering the same house. |
| ***Cont'l Cas. Co. v. Coregis Ins. Co.***, 213 F. Supp. 2d 673 (S.D. Miss. 2002). | Involved two liability insurance policies covering the same entity and same injuries. |
| ***United Nat'l Ins. Co. v. Mundell Terminal Servs., Inc.***, 740 F.3d 1022 (5th Cir. 2014). | Involved two commercial property insurance policies covering the same property. |

**MAXWELL, BEAM AND CHAMBERLIN, JJ., JOIN THIS OPINION.**